We'll proceed for the petitioner on this next case, which is City & County of San Francisco v. The United States Environmental Protection Agency, number 2170282. For petitioner, we have Mr. Silton. And for the government and EPA, we have Ms. Carter. Case is set for 20 minutes per side. And so if petitioner wants to make rebuttal argument, please stop before all the time is gone. And you can, Mr. Silton can proceed. Thank you, Judge Gould, and may it please the court. My name is Drew Silton. I'm counsel for the petitioner, City & County of San Francisco. I would like to reserve four minutes of my time for rebuttal. EPA's decision to issue San Francisco's Clean Water Act permit is arbitrary and capricious. Would you put the mic over more straightforwardly? There you go. Is this better, Your Honor? Yes. EPA's decision to issue San Francisco's Clean Water Act permit is arbitrary and capricious because the permit imposes requirements that the agency has not properly determined are needed to protect water quality standards. In order to impose the permit's two sets of contested provisions, EPA needed to determine that San Francisco's existing pollution controls are inadequate to meet water quality standards. EPA made no such finding. Instead, the agency just assumed that the controls are inadequate and forged ahead. Did it assume that they're inadequate or did it just say, we want you to prepare a new long-term control plan? Your Honor, on the issue of the long-term control plan update, there isn't even the matter of an assumption. There is the issue that EPA has not even, that EPA at this point is saying that the long-term control plan update is needed in order to make an assessment as to whether or not, water quality standards are being attained. And that's actually, if I could explain the real crux of San Francisco's concerns about the long-term control plan update, because I don't think it necessarily jumped off the pages in the papers, which was that San Francisco's objection is not to EPA's need for information. To the extent EPA needs information to assess San Francisco's system, San Francisco's planning, or changes to the sewer shed, EPA is entitled to this information. The problem is the vehicle that EPA is using, and particularly in that EPA's information gathering is joined with a requirement as part of the long-term control plan for San Francisco to submit a proposed set of controls that have an implementation schedule. By virtue of the fact that they are, that the controls are part of the long-term control plan, the way this is structured in the permit, EPA is effectively committing San Francisco to the implementation of those controls without having first made the threshold finding required by the CSO control policy, which is non-attainment of water standard. I have a specific question about the CSO control policy, and that is the provision at, I guess it's Roman 2C3C, and this is the provision about sensitive areas, and it says that a long-term control plan should have as one of its elements this requirement that where elimination of relocation has been proven not to be physically possible and economically achievable, permitting authorities should require for each subsequent permit term a reassessment. So even if you were correct on the broader question of whether or not they can make you do, go back to square one on the long-term control plan, why doesn't that language say that they can at least address that issue in subsequent permits? Your Honor, there are, I think, two answers to provide to that, Judge Collins. The first is that in the context of this particular permit, what EPA is requiring as part of that sensitive areas analysis sweeps far more broadly than what is actually specified in that part section, I believe you said 2C3, as well as what's provided in the actual permitting provisions in section 4b2e, which is elimination and relocation, and based on only two sets of considerations, changed financial circumstances, as well as the development of new techniques to achieve elimination and relocation. As we explained, task three sweeps far more broadly than that. The second issue, though, is the nature of the exemption that San Francisco has under the policy. Under section 1C1, the policy, and by extension Congress through the codification of it, specified only two sets of provisions that apply to a community like San Francisco with that exemption, the post-construction monitoring and the operational plan, and EPA and Congress knew how to say when they wanted sensitive areas to apply to an exempt community. They did so in section 1C2, so the agency and Congress knew how to say when they wanted the sensitive areas provisions to apply, but they chose not to specifically in the context of the exemption that San Francisco has. I'm not sure I read the Federal Register provision quite the same way. I'm looking at section C that you're referring to. It begins, EPA recognizes that extensive work has been done by many regions, states, municipalities to abate CSOs, as such portions of this policy may already have been addressed by permittees previous efforts to control CSOs. Therefore, portions of this policy may not apply as determined by the permitting authority on a case-by-case basis under the following circumstances, and then as I read it, what follows is a series of examples. I don't read that as limiting the authority of the EPA. I regard that as examples as to what may happen depending on the state of completion of the work that's already been done. If that is true, your honor, we have a circumstance where we have multiple findings by the agency that San Francisco has been exempted under section 1c1, starting in the... That's exactly right, and you've never, because of that, you've never done a long-term control plan. You've got a bunch of documents, the most recent of which I gather is about, in terms of what you submitted to the EPA, is about 1990. Is that right? That's correct, your honor. So 30 years of no documents submitted to the EPA, and you say you don't have to do a long-term plan. Your honor, it's not that we're saying we do not have to do a long-term plan. The long-term plan, that is the basis for the current set of combined sewer controls that you will find on the west side of San Francisco today, is covered by those documents going through 1990. The issue here with the exemption is that EPA did look at those documents and determine that San Francisco was not covered by the planning and construction provisions of the policy. EPA is certainly able to ask that San Francisco provide additional documents, and then clarify things on an informational basis. The crux of the issue, though, with this particular plan update, and that I, again, would really like to emphasize, is that it predetermines, because it requires San Francisco to skip to the step of proposing a set of specific controls to achieve additional elimination, relocation, or reduction without the threshold finding that San Francisco's existing controls are meeting water quality standards, is already committing San Francisco now, before the agency has made any finding that water quality standards aren't met, to actually having to build the controls that are being requested in this plan update. There's no checkpoint in this permit for EPA to subsequently make a determination as to whether water quality standards are being met or not, before San Francisco will be required to implement them, by virtue of the fact that the plan will be updated, along with a new implementation schedule that's required under, I believe it's task 3G. Those controls are part of the plan, they're part of the implementation schedule, and by operation of section 4B2 of the policy, EPA will be required to make San Francisco in its next permit, actually build those controls. And the selection of those controls in the tasks task 3, do not provide any, again, any checkpoint, nor do they specify that the reduction San Francisco has to achieve. Let me ask you this, let's assume that San Francisco had not qualified for the exemption, that is to say, let's assume that when the policy is implemented, San Francisco had not done any work, and you were required then to compile one of these long-term control plans. Would this have been an appropriate requirement for a long-term control plan, if you were required to do one in the first instance? In general terms, yes, your honor. At the outset of planning, you would be required to go through the system characterization steps, and do an alternatives analysis to assess the level of control you need to meet water quality standards, up to a point though. Generally, you would be specifying that the level of control you need is to meet water quality standards. That specification, that the goal San Francisco has to be trying to hit is meeting the standards, is absent from this permit provision. So we're in a circumstance where EPA is committing San Francisco to actually implement additional controls. When you say not meeting water quality standards, how do I figure into this the current permitting that allows San Francisco to have eight events per year in which raw sewage can be put into the on the west side, and these close-in outfalls? And your honor, I would like to clarify that the overflows don't because they're the result of high rainfall, and they do, they all, these overflows reserve, do get equivalent to primary treatment. Now the way the water quality standards work under the state water board's order, is we have this initial finding, but maybe the word raw sewage is wrong, but it's enough so that San Francisco is required to post no swimming signs because of the, because it was discharged into the water, correct? Your honor, it is enough, although I will note the number of no swimming days that EPA observed is actually 17 during a single year, was fewer than the 25 that the state water board assumed for the purposes of granting the exemption and saying that San Francisco's eight overflows per year would not compromise the beneficial uses. And just to answer the last part of your question, how the water quality standards work, San Francisco is authorized to have the eight overflows per year. San Francisco has been below that average. Because we're in a drought, pretty much every time it rains, you get an overflow. Anytime you get a serious rain in San Francisco, that's what happens. Your honor, we have achieved those significant improvements going from more than, from over a hundred prior to the development of these controls, to fewer, to fewer than eight per year. But I would also just point out that then the water quality standards themselves, San Francisco is exempt from the bacterial water objectives. And then the next piece of this is that San Francisco is actually, San Francisco is, and your honor, if I might answer this question, I want to make sure I get the rest of the merits subjects, and then has to meet the remaining water quality standards in the ocean plan to the greatest extent practical. Meaning that if San Francisco is actually hitting those base water quality standards, it's compliant. But if it's not, say we're at a level that's above, EPA still needs to determine what is the greatest extent practical, sort of above that to give San Francisco an appropriate amount of relief from the base water quality standards, that nonetheless recognizes San Francisco can achieve full compliance. But I'd like to turn briefly to the generic water quality prohibitions in the permit, which effectively tell San Francisco that it has an additional obligation to protect water quality standards. But EPA imposed them only on the basis of assertions that San Francisco's existing water quality based limits are inadequate to protect water quality standards. EPA hasn't provided a factional analysis in support of its conclusion, but the San Francisco's existing limits will not necessarily protect the standards. And we also have the issue that under the second circuits, it seems to me that our Portland decision pretty much forecloses your argument. Not at all, your honor. So the Portland decision, and this is an important consideration to raise, the Portland decision concerned enforceability, which under the Clean Water Act, not to be too reductive about it, more or less means that the permit term was written down on the piece of paper. As a consequence of how the act is structured, in any citizen suit or enforcement proceeding, the court is required to enforce the permit provision as it's written on the page. And beyond that, all federal courts are actually barred jurisdictionally in an enforcement action under section 1369B2 from considering the validity of a permit term in an enforcement case. So the Portland case decided enforceability, whereas the validity issues are effectively firewalled off as a jurisdictional matter. The EPA tells us that this provision that you're now talking about, I know now challenging, is routine. Is that right? That's correct, your honor. So if you're right here, we require a massive rearrangement of what the EPA routinely does, correct? Your honor, we are requiring a change of a practice that the second circuit and NRDC already recognize is inconsistent with section 1342A2. I think I'll hear from the EPA as to why that second circuit case really doesn't control here, because that was a nationwide proposition for discharge from seagoing vessels, correct? That was the basis of the permit, but the rationale was the same, your honor. EPA was trying to use a generic prohibition to bridge the gap and address residual uncertainty about compliance with water quality standards. And the second circuit held that you can't use a generic prohibition because of its lack of instruction to actually ensure compliance with water quality standards to bridge that gap, because it doesn't actually specify concrete measures for a discharger to take. And I would add as well, your honor, that NRDC, as well as the other second circuit case law that it's based on in Waterkeeper Alliance, has actually been applied by this court recently in the Food and Water Watch decision from just last year. And because of the factual similarities, NRDC should apply. Food and Water Watch case out of Idaho, that one? Yes, your honor. Involving the CAFO permits. The one I wrote, right? Indeed. And your honor, I would just now like to turn briefly to the remedy issue, which is a consequence of the particular way in which EPA and the state structured their permit. Can I ask a question on that point? And it may be a stupid question, but I'm going to ask it anyway. You know, you need a permit to run this facility and make the discharges. So here you're in the position of challenging the grant of the permit because you don't like some of the conditions. If the permit is set aside, what do you operate under? Is it the prior permit? Is some interim authority? What happens? Yes, Judge Collins, we operate under the 2009 permit. Under the Clean Water Act, your previous permit is administratively extended if you don't have a new permit in place. So if this permit were set aside, that one would become operative again? That's correct. Has this one taken effect? Has a stay been in place? Your honor, this... What permit are you operating under right now? We are operating under this 2019 permit, your honor. There are no stays in place either in this court or from any other consequence of this appeal. Okay, but if it were set aside, then would the 2000, the prior one would come back? Correct, your honor. Okay. But the agency action under review here remains EPA's decision to issue this permit. As the court reviews agency EPA's actions under Section 1369B1, the action here happens to be on a permit that was structured jointly by the agencies to require the authorization of both of them. The relief we're asking for is that for the consequences, for the purposes of the Clean Water Act, that the court's vacater recognizes that both agencies authorization was required for the permit to be valid. And as a result of the vacater of one of those necessary authorizations, the permit would not be effective just for the purposes of the Clean Water Act. There are questions under California law and about the California agency action that are not part of this proceeding, nor would we ever ask this court to address them. And unless there are other questions, I would like to reserve the balance of my time. Okay, that's fine. Thank you, your honor. Ms. Carter. Please proceed. Thank you, your honor, and may it please the court. My name is Bess Carter, and I represent the United States Environmental Protection Agency. At issue in this case is EPA's ability to adequately regulate discharges from San Francisco's oceanside system. By San Francisco's own estimate, the system discharges almost 200 million gallons per year of sewage and wastewater directly onto San Francisco's beaches. Can you get closer to the microphone? I'm having trouble hearing you. Yes, your honor. Is this better? Yes. Thank you. Your EPA's inclusion of the narrative prohibition in this permit is consistent with Ninth Circuit precedent and is expressly authorized by the Clean Water Act. Specifically, Section 301B1C of the Clean Water Act instructs EPA to include in its permits any limitations necessary to meet water quality standards. That is exactly what EPA did here. I'm going to say the same thing that Judge Collins said, although I don't think his question was stupid. Mine might be. When you say it has to meet water quality standards, what do you mean? What are those standards? Where do we look to find them and what does this narrative requirement actually mean in practice? Certainly, your honor. In this case, as EPA explained in the permit, the standards that apply are the ones found in California's ocean plan, which most recently is from 2019. So that includes the beneficial uses laid out in California's ocean plan as well as the water quality objectives or criteria for various pollutants in that document. The language you just quoted seems to envision that the limitations that will be imposed are distinct from the water quality standards. Whereas here you just said, well, here's an additional condition. Don't let the standard be violated. Don't contribute to the among all the particular uses and the contribution to the problem. That's the core of the Clean Water Act. No, your honor. This court actually has specifically recognized in Northwest Environmental Advocates. We didn't have the validity of the permit condition. The only question we had was whether we were going to read an exception into 505 that would take away the standing of private parties to enforce a condition that was already in there. Here the question is, can the condition be in there? We didn't have that question before us, did we? That's correct, your honor, that that was a challenge to enforceability rather than validity. But the grounds on which enforcement of the narrative prohibition were challenged in that case were the same as here. That prohibition wasn't enforceable specifically because it was a narrative prohibition rather than a translation of the water quality standards into specific numeric effluent limitations. So in that case, this court recognized the narrative prohibitions like this one are an important enforcement tool for regulators in the CSO context. So suppose you have a lake and there's 20 companies around it all discharging into the lake and you put this condition into everyone's permit. If one of them, you know, then starts dumping large amounts of stuff, hits the limit, is it now illegal for everyone else to discharge? Because then they're contributing to it. I'm not sure about the answer to that, your honor. It seems to me the answer has to be yes. And you're creating exactly the situation that Arkansas versus Oklahoma said the Clean Water Act did not do. That it is not a violation of the act to contribute to a lake that's limits already been hit. Well, your honor, I think EPA has enforcement discretion. And so it certainly would use that discretion. And if there was one primary violator, it would be more likely that EPA would find that violator. But under your theory, you could go after all 20. They're all in violation of the permit if one company hits the limit, or they all need to shut down their operations. Because you didn't do an allocation. You just put the condition in that the ultimate limit can't be exceeded. Well, I think as a practical matter, your honor, if it was one company that was committing the violations, and the other companies were, you know, following their permit limits, EPA probably wouldn't find that no one else could operate in that circumstance. But you could. I mean, that's your discretion. You could come in here and shut them all down because they're all violating the permit, because they're contributing to hitting the limit. Your honor, I think EPA would probably find that it depended on the amount that they were contributing. But again, that's that's not the circumstance we have here where we have one polluter. So it's very clear who would be contributing the pollutants in this scenario. So let me make sure I understand that. So that question is not presented here. Is there any other entity discharging into the ocean along Ocean Beach and then China Beach where these outfalls are? I believe these outfalls are the only discharges permitted on those beaches. So that question actually, while an important question, doesn't seem to be presented here. No, it's not an issue in this case. And returning to Northwest Environmental Advocates, your honors, the fact remains that the language in that case is directly applicable to the narrative prohibition here. And a finding that EPA could not impose the narrative prohibition in this case would be inconsistent with the language in that case, in that case, as well as inconsistent. What do you, how do you respond to the argument, though, that the validity of the condition was not presented and the court had no choice but to enforce it as written? Well, your honor, if the court had no choice at all but to enforce it, then I don't think it would have, that challenge wouldn't really have been an issue because the court would have just had to rubber stamp. But instead here, in that case, the plaintiffs, or the, excuse me, the defendants, were arguing that because it was a narrative prohibition, it could not be enforced in a citizen suit. So it raised the same issues that are central to the discussion of the narrative prohibition in this case. So you disagree with the analysis proposed to us by the other side on that question? Yes, your honor, and we would argue that the language in Northwest Environmental Advocates, as well as the holding in Natural Resources Defense Council versus LA, is directly applicable to the narrative prohibition. And how would you That case is indistinguishable for three reasons, your honor. The first, as you pointed out, is that that was a nationwide permit for vessels. So that covered many different vessels in multiple different states. And so a central part of the court's reasoning there was that EPA could not point to exactly which water quality standards applied in that case. And that contrasts to this case where EPA has specified that it's the standards from the California Ocean Plan that apply to San Francisco's discharges here. And in addition, in that case, the narrative prohibition was the only water quality-based effluent limitation that EPA applied in contrast to this case where there are multiple water quality-based effluent limitations in the backstop. And the third point I would like to make, your honor, I guess there are two additional points. The first is that that case did not occur in the CSO context and the holding from Northwest Environmental Advocates did occur in the CSO context. So looking at this case specifically, it's necessary, and this court recognized in Northwest Environmental Advocates, that in this context, EPA cannot always translate every water quality standard into a specific numeric effluent limitation. And so in contrast to that case involving vessel ballast water discharges, this case is in the CSO context where narrative prohibitions like this are often of the ultimate water quality standard itself was challenged for its inclusion in the permit. Not that I'm aware of, your honor, other than the case in the Second Circuit. But as I've explained, that case is distinguishable and it can't contravene the directly applicable language from multiple cases within this circuit. Moving on to record support that EPA had for its inclusion of the narrative prohibition, the sort of basic principle, as I've explained, is that EPA has to ensure that any permits that it issues do not authorize dischargers to violate water quality standards. And in the CSO context, EPA bases the conditions for wet weather discharges on the information in a city's long-term control plan. But as we pointed out in our briefs here, San Francisco has never created a long-term control plan and its planning documents are outdated and inaccurate. They no longer reflect the way the Oceanside System operates. EPA pointed to a number of changes that have occurred, as well as the fact that citizens, residents of San Francisco, were notifying EPA that the sewers were overflowing and discharging sewage directly into their basements, into their businesses, and onto their streets. But the CSO policy which Congress codified has two provisions on, you know, making changes and revisions to long-term control plans. And both of them, both the one in C1, what is it, it's 1C1, and then the one in 4B, both are triggered by a failure to obtain water quality standards. But you don't claim you meet that condition. Well, your honor, as we explained in our brief, we do not, EPA does not read that language to create a necessary condition, instead it creates a sufficient condition. As this court recognized in the Carver case, it would be a different circumstance if the CSO policy that's said that- This is a comprehensive document that establishes how to set up one of these, and then once you've set it up, it tells you how it can be modified. And you claim that you have free floating authority apart from the document to just make other revisions as you see fit? Well, your honor, it's not free floating. We would argue that it's based in the provision from the CSO policy. In part, you know, one of the grants of authority here in the CSO policy is the provision that says that permits should be revised to include any appropriate permit requirements. So that's a very broad grant of authority. But you left out the next phrase, which is consistent with section 4B of this policy. And then when you go to 4B, you see exactly the same condition about not meeting water quality standards. Yes, your honor. Section 4B, it's a very broad section that establishes some of the basic elements of a CSO permit, and that includes the requirements to create and carry out long-term control plans. So EPA reads that language as a broad grant of authority to establish appropriate permit requirements consistent with section 4B of the CSO policy. If I can follow along this same questioning that Judge Collins is pursuing, I understand the analytic argument you're making that the city and county of San Francisco say, well, these are the only circumstances in which a new long-term plan can be required, or in San Francisco's case, a long-term plan because they never had one. You say, well, that means, no, those are just circumstances in which it would be required, but they're not the only circumstances. I get that. So let me ask a version of the same questions I think Judge Collins has been asking, where do you get the authority to ask for a long-term plan from San Francisco at this time? Yes, your honor. That would be in part in the provision that I was just pointing to that says EPA should incorporate in permit revisions all appropriate permit requirements consistent with section 4B. It's also in part in the parts of the CSO policy that require continued assessment of discharges to sensitive areas. And how are sensitive areas defined? They include beaches, your honor. So no question about what we're talking about, Ocean Beach, China Beach, and Baker Beach, they're all sensitive areas. Yes. That's not disputed. That's correct. As well as the other four beaches that receive these discharges. What's your response to the city's argument that you don't have any authority under the consideration of sensitive areas provision because they were exempted under 1C1 and not 1C2? Honor, as I've explained, EPA does not read that language to create a requirement that only when a city is found to be violating water quality standards may EPA require a long-term control plan update. Instead, it does say that if a city is violating water quality standards, then EPA is required to have a city update its long-term control plan. But that is not the same as saying that EPA may not require an update to a long-term control plan unless the city is violating water quality standards. And your honor, as I was explaining, EPA needs an updated long-term control plan. No, just before we leave, I just want to make sure I understand your argument. So your argument that the consideration of sensitive areas provision applies hinges on the revised control plan language or some authority to revise the plan. So you don't contend that apart from revision authority, you would have the ability to apply the consideration of sensitive areas section? No, I think I must have misunderstood your question, your honor. EPA also noted in its brief that there are many different provisions in the CSO policy that require ongoing assessment of discharges to sensitive areas in addition to the provision in 1C2. So that EPA would disagree that that EPA cannot require reassessments of sensitive areas if San Francisco is only subject to 1C1. But 1C1 and 1C2, they seem to be sort of initial transition periods. 1C1 is if you basically got the system done already. And then 1C2 is sort of you're kind of halfway there, but you haven't finished it. And they seem to have a different list of what parts will be made applicable. And the consideration of sensitive areas is on the second list, but not on the first list. What's your response to that argument? That is correct that that's the language in 1C2. But your honor, there are other portions of the CSO policy, including, I don't have the page numbers of the CSO policy, but the record numbers are record ER 1647 and 1651 that both require ongoing assessment of discharges to sensitive Right, but they're saying that because the provision on 1647 is on the C2 list, not on the C1 list, it doesn't apply. Now, maybe you could make it applicable under revision authority. I understand that argument, but I'm trying to understand whether there's an argument independent of revision authority. I'm sorry, your honor, I'm not sure I understand the question. I'm just, do you agree that the C, the 1C1 list of what it makes applicable, setting aside the revision issue, but just in the first instance that the section three on consideration of sensitive areas on 1647 was not applicable to the city by virtue of the 1C1 waiver? No, your honor, EPA does not agree with that interpretation. Why? Because your honor, those do not create exclusive conditions for when EPA can require long-term control plan updates or consideration of sensitive areas. EPA reads the CSO policy as clearly requiring sensitive areas reanalysis in every permit reauthorization. And so it simply can't be the case consistent with the CSO policy that EPA for permits exempted under 1C1 is not allowed to require ongoing reconsideration of sensitive areas discharges. So let me ask you this. You're obviously objecting to the contention of the city and county of San Francisco. They contend or it contends that you need to find a violation of water quality standards before you can require the preparation of a long-term control plan or a long-term control plan. What's so hard about determining whether or not they meet water quality standards? Why is that an objectionable way to go about it as a practical matter? I understand it as a matter of reading the law. You don't want to read it that way, but what's so hard about showing that they don't meet water quality standards? Well, your honor, as a practical matter, EPA did include increased monitoring requirements in this permit reissuance. So hopefully there will be additional monitoring that happens going forward. But EPA also found that it had adequate evidence to create a reasonable doubt that San Francisco would be able to or that the effluent limitations in the permit that were based on these outdated planning documents. EPA reasonably concluded that because those planning documents no longer reflect the way the oceanside system functions, EPA couldn't be sure that effluent limitations based on those planning documents would ensure that water quality standards were not violated. So there's sort of a structural reason under the CSO policy that the long-term control plan update is necessary. I hesitate to take you over time, but this question is, I think, present in the case. We've obviously got two permitting authorities. We've got and this is a jointly issued permit. Obviously, the trigger for us is the one outfall that's outside the three-mile limit. Most of them actually are within California territorial waters and controlled by California. What would be the consequence for California if we were to agree with you or the consequence for California if we were to agree with the city of San Francisco? The immediate consequence of either ruling would probably be that the state court case would no longer be stayed and San Francisco would continue or perhaps it wouldn't, but could choose to continue challenging the permit. I get that, but I'm trying to figure out is there any preclusive effect from our holding on California and what California might under California law? I can't speculate about what California, what justifications it might put forward for this permit under California law. I know that in California's amicus brief, they did assert that there were independent justifications, but I'm not familiar enough with California law to know what those are. Counsel, if I may interject a question. I know you're over your time, but we'll give you a little extra time. My question is this, do we have circuit authority and if so, what's your best authority on a need for EPA to have a broad discretion to make its decisions about permits in order to Certainly, your honor, the clearest place where that authority would be found would be in section 301B1C of the Clean Water Act, which requires EPA to include any limits necessary to meet water quality standards in its NFTYS permits. So that sort of goes to the heart of the issue here, which is that EPA could not be sure that the permit, the effluent limitations in the permit that were based on the outdated planning documents would adequately meet that requirement from section 301B1C, which is why the narrative prohibition was necessary, as well as why it's necessary for San Francisco to update its long-term control plan to reflect the way the Oceanside system operates today. Thank you, counsel. Can I just ask one more question and that is, do you disagree with counsel's answer to my question about what would happen if the federal permit were set aside, would that bring back the 2009 permit? Your honor, I do disagree with San Francisco's answer to that question because that permit has expired and so it wouldn't automatically revive, we don't believe. So if we set it aside, they'd have to discharge if you were to set aside the whole permit, but I don't think anyone wants that to happen, your honor. Instead, if you were going to vacate the challenge conditions, which of course we urge you not to, we would request that you only vacate those specific conditions, not the entire permit. That's essentially what you asked us to do a little bit after the fact in the Idaho case. Well, certainly. If we set it aside and you said, well, wait a minute, don't set it aside in its entirety, just set aside the conditions. I mean, you came back and specifically asked for that. Yes, your honor, because it doesn't help anyone if San Francisco isn't allowed to have any discharges, then the Oceanside system would be operating in violation of the Clean Water Act. Thank you. Are there no further questions? We respectfully ask that you deny San Francisco's petition for review. Okay, thank you, counsel. I think the city gets some rebuttal time. Thank you. And actually, Judge Collins, I have three of your questions I would like to elaborate on that you posed to my friend from the Justice Department. The permit would be administratively as a consequence of San Francisco having timely filed its permit application prior to the expiration of the 2009 permit. To answer your other question about are the generic prohibitions effectively an abdication of EPA's responsibility to set water quality-based limits, they're that and more. When you look at the Fola Cole case, you see that what the generic prohibitions actually do is shift the function of defining what it means to comply with a particular water quality standard. So what is the particular level of water quality that you need to achieve the standard that's specified? In that case, there was a narrative habitat standard. The district court effectively sat in the shoes of the permit writer. Having to make determinations about what habitat index protects that relevant water quality criterion, at what level should that habitat index level be set, and then what is the effect of the dischargers effluent on the receiving water quality, causing it to go above or below that particular level. So it's not abdication. It's not just abdication. It's actually offloading. EPA's duty under the Act to define what it means to comply with water quality standards and to set limits that ensure compliance with water quality standards on the district court's hearing enforcement actions. The second question that you posed, Judge Collins, was about whether or not there was another case dealing with, say, the direct incorporation of water quality standards into a permit. And though it didn't involve a generic prohibition, there is a case cited in the law professor's brief, Trustees for Alaska from 1984. In this circuit, involving a series of EPA permits in which water quality standards for both arsenic and I believe turbidity were directly incorporated into the permit, EPA asserted that by directly incorporating those water quality standards directly into the permit, it discharged its duties under Section 1311B1C of Title 33. This court disagreed, finding that EPA had an obligation to set effluent limitations and that direct incorporation of effluent limitations of the water quality standards did not discharge that obligation. Unless the panel has any additional questions, I would like to thank you. I have one question for you. I'd like to know what's your answer to the same question I asked Ms. Carter, and that is, what do you think is the authority, your best authority on the discretion of the EPA, and maybe on your side of the case, would be lack of discretion to be flexible in trying to ensure quality, water quality standards are adequate for public health? Your Honor, I believe the best authority for San Francisco is indeed, is actually not on the precise issue of water quality in this circuit, but from the Second Circuit, it is the Natural Resources Defense Council case, which again, as Judge Fletcher acknowledged, was relied on, along with the Second Circuit case law, it's based on, in food and water watch. Thank you. Thank you. I think, again, I want to thank both Mr. Sheldon and Ms. Carter for their excellent arguments. It's an important case, and we appreciate your help, and the City and County of San Francisco versus EPA case shall now be submitted, and the parties will hear from us in due course.
judges: FLETCHER, GOULD, COLLINS